By the Court.—Curtis, Ch. J.
The case presents several exceptions, but none, that call for a reversal of the judgment. The date of the telegram, and the testimony, especially of the defendant Brooks, that he was advised on the 26th of September of the additional subscription of $8,000 more, indicates that the finding that the plaintiff’s agreement with the defendants, Brooks and Mifflin, was made on- the 27th of September, should have been that the agreement was made on the day previous. It does not appear that this finding, as it stands, prejudices the respondent or the appellant, but it is apparently one of the errors which should be amended under section 721, subdivision 9 of the Code of Civil Procedure.
As regards the disposition of the appeal, the opinion of the judge at special term expresses the views which, after considering the case, we have arrived at.
It is as follows :
“ Sedgwick, J.
The relation between Mifflin and Brooks should be determined only to the extent that it is necessary for the determination of the plaintiffs’ rights, under his transaction with Mifflin. If Mifflin were Brooks’ agent in the matter, it is not material to find whether the agency arose from a partnership between them, or from a- special or implied authority to obtain subscriptions.
“I find, as a matter of fact, that Brooks authorized *16 Mifflin to take subscriptions. I also find that such authority was ended by Brooks’ telegram of September 28, in which were the words: ‘ Balance subscriptions too late ; arranged otherwise.’ Down to the receipt of that by Mifflin, he had authority to take the plaintiff’s subscription.
“In view of the plaintiff’s right to have his interest fixed, upon his payment of the money, Mifflin must be held to have received the $3,000 when it was paid at the bank in Newburyport, to which he had sent it for collection. The plaintiff paid it, he said, on Monday night.’ This does not mean after dark, but in the latest hours of bank business, or in the afternoon.
“I do not mean to intimate that Mifflin was only a subordinate of Brooks. Their relations may have been mutual, and each on equal footing. It is not necessary to decide as to this, especially as there is an action between them.
‘‘ Mifflin being Brooks’ agent, the latter was infected or chargeable with knowledge of what Mifflin did, and the obligation he incurred within the actual scope of the agency, and no farther.
“Mifflin did this, viz., he obtained a subscription of money, not upon a promise to return money, but to use it with other subscriptions in buying the stock in question. So far as subscribers were concerned, Brooks was to be the common agent for the purchase of the stock. He, too, was, as Mifflin was, a trustee for the subscribers.
“The subscriptions were placed with the parties under a trust and confidence, and not to establish the relations of debtor and creditor. I do not mean to decide that the consequences of this trust would not be affected by an implied understanding that the parties would not be held to purchase for the subscribers, if for any sufficient reason the funds subscribed could not *17 be used in that way, or by only the fact that a particular subscription was, without a breach of trust, in excess of the required amount. But the trust includes the general obligation to use the funds subscribed for the particular object.
“ In my opinion it is not a sufficient reason to omit to purchase for a subscriber, that the agent or trustee chose to use his own funds. He is under an obligation not to do it; and at the least, if at any time before the purchase is consummated, the subscriber pays his money, and it is in the hands of another agent, with the constructive knowledge of the purchasing agent, when the latter consummates, he does it for the subscriber. Still more surely if he has actual knowledge.
“These considerations lead to the suggestions that up to the payment actually to Mifflin, the plaintiff here had no interest and was under no obligation, and that when he paid the money, he was not and did not intend to become himself a purchaser. He was placing money in the hands of another who was to purchase for him. If such other did purchase in his own name, but as agent or trustee for the plaintiff, the statutes of fraud in New York or Massachusetts do not avoid the transaction. The actual purchase in New York or Detroit was not void. An agent using his own name in the written contracts of purchase is bound to deliver to his principals (Tomlinson v. Miller, 7 Abb. Pr. N. S. 364; Dykers v. Townsend, 24 N. Y. 57, and many other like cases; Cobb v. Gtoodhue, 11 Paige, 110; Wain v. Warlters, 2 Smith L. C. 316, 6 Am. ed.).
“Brooks, as I understand the evidence, had made no valid contract for the purchase of the stock when he left New York for Detroit, and would not be able to consummate a parchase without subscribers. It is beyond doubt that up to and at and after the time of his making the contract in Detroit he contemplated the *18 necessity of Mifflin obtaining subscribers from persons unknown to him.
“ On September 24 he wrote from New York: ‘ Get some new subscribers if possible ; I have the Baker lot in view for $10,000 and by telegraph on same day: ‘ Get all subscriptions possible.’ On the 26th Mifflin telegraphs : ‘ Have placed $3,000 more; answer if right.’
“Instead of telegraphing answer, Brooks wrote by mail: ‘I have your telegram asking about $3,000-more ; I cannot give answer about that to-day, but will upon my return to New York or Boston.’ On September 27 Brooks telegraphs to Mifflin: ‘ Remit $15,000, subject to my order on delivery of stock and bonds for Perkins and your account. This completes transaction.’ This telegram was not a decisive statement that there were to be no more subscribers, for the day before he had said he could not give answer then, but would in New York or Boston. Mifflin could not have received the letter, but it is important testimony that Mifflin had not made up his mind as to what was to be done with the $3,000 subscription or to revoke Brooks’ authority to receive it.
“Up to the 28th, I believe, on the facts, Brooks had not prepared himself to - stop Mifflin’s subscriptions, even after an arrangement was made to which he testified very obscurely. Unless he made such an arrange'ment he would not be able to reject the $3,000.
“ It is in evidence that the contract was made in Detroit, $5,000 had to be paid. His share of that would be $2,500. He ‘ borrowed part and got rest from New York’ (his letter of September 26); the amount he got from New York was $3,000 and odd; of course the excess over $2,500 would have to be accounted for to the New York parties. That leaves $2,500 that had finally to be made either by subscription or some arrangement by which Brooks could furnish it; at first he believed it would have to be arranged for in *19 New York or Boston, as he said in his letter. But in consequence of something between himself and Darling, in Detroit, he was able to command this amount in Detroit. The amount he received, as I should judge, from a sale of some stock to Darling with some cash he had in his pocket, enabled him to take a fixed position as to the $3,000 subscription, but for some reason he did not wish to avow it. He did not avow it until the telegram of September 28th. 'Balance subscriptions too late ; arranged otherwise.’
“The turning-point in the- issue as to when the agency was ended, is the time when this telegram was received. Was it before or after the plaintiff paid his draft ? There is no specific proof as to this. It does not appear when Mifflin received it. The plaintiff has proved enough to create the presumption of continuance of the agency down to the time of the payment.
“There is a presumption of some weight that Mifflin could not be guilty of the injustice, if not fraud to the plaintiff, of taking his money after receiving such a telegram. On these considerations, and the further consideration of the indecision and wavering of Brooks in regard to the subject-matter of the telegram, I am of the opinion' that the burden of proof rests upon the defendant of showing when the agency was closed by a decisive and affirmative act on his part. It is to be observed that if the subscription was paid before the consummation of the purchase in New York, and at a time when Brooks was a party to the payment through his agent, Mifflin, it is not material that Brooks did not have actual knowledge of the payment.
‘‘ His obligation was as strong as that of a contract with plaintiff to have the knowledge. And again, if he allows the plaintiff to part with his money, and use that as one of his resources, meaning to fall back upon it, if it be for his own interest, he does virtually use the money.
*20 “It is seen from these observations that I do not deem the transaction to be the equivalent of a sale of stock from Brooks to the plaintiff. He was not dealt with as an owner selling stock, nor was he an owner of stock, nor did the arrangement contemplate the transfer of stock from Brooks to the plaintiff excepting nominally. Brooks was to use the funds in a purchase from the Detroit parties. It was not intended that the real title to the whole should first rest in Brooks, although it was contemplated that he should use his own name. His making the executory contract in Detroit did not make him owner. The consummation of it required the use of the subscribed funds. Before he became owner he made a legal arrangement, by which he was to act as agent or trustee for the subscribers in becoming nominal owner.
“ In my view of the case, the assignment made by Brooks has no operation. It was not delivered to the assignee or to any one who is shown to have been authorized to act for her. But especially I think he had no title to the subject-matter involved in this action.
“ I think that in any aspect of the case, whatever technical view is taken of it, that the plaintiff is entitled to have from the stock in question the amount which was to go to the subscribers severally, according to the amount of subscriptions, and that he is not confined to, an action of conversion or of claim and delivery, but that a court of equity has a right to administer the distribution of property impressed as this is with a trust.
“The plaintiff should have judgment with costs. No allowance.”
The judgment appealed from should be affirmed, with costs to the respondent.
Speir, J., concurred.